PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2088
_____

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF HUMAN SERVICES,

Appellant

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; SECRETARY UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 1-15-cv-01169)
Honorable Christopher C. Conner, District Judge
_____

Argued on March 12, 2018

BEFORE:  JORDAN, KRAUSE, and GREENBERG, <u>Circuit</u>
<u>Judges</u>

(Opinion Filed: July 25, 2018)
_____

W. Scott Foster, Esq. [Argued]
Commonwealth of Pennsylvania
Department of Human Services
Office of General Counsel
3rf Floor, Health & Welfare Building
Harrisburg, PA 171207

Jason W. Manne, Esq.
Manne Law Office
P.O. Box 81860
Pittsburgh, PA 15217

   *Counsel for Appellant*

Melissa A. Swauger, Esq.
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

Suzanne Yurk, Esq. [Argued]
United States Department of
Health and Human Services
Office of the General Counsel
150 South Independence Mall West
The Public Ledger Building, Suite 418

Philadelphia, PA 19106

*Counsel for Appellees*

_____

OPINION

_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.  INTRODUCTION

The Commonwealth of Pennsylvania Department of Human Services ("Pennsylvania") appeals from a decision and order of the District Court for the Middle District of Pennsylvania entered March 13, 2017, affirming a decision of the United States Department of Health and Human Services Departmental Appeals Board ("Appeals Board" or "Board"). For the following reasons, we will affirm the District Court's order and thus will affirm the Board's decision.

## II. BACKGROUND

This case involves a reimbursement dispute between Pennsylvania and the Centers for Medicare & Medicaid Services ("CMS") over the cost of a provider training program.  From 1996 to 2011 Pennsylvania claimed the costs of the training program as administrative costs under its Medicaid program. CMS reimbursed Pennsylvania for about $3 million of those

3

costs, but, after an audit of Pennsylvania's charges, it sought a return of the money on the ground that funds Pennsylvania spent on training programs were not reimbursable to the Commonwealth from the federal government as administrative costs under Medicaid. In reaching its decision, CMS relied heavily on a 1994 State Medicaid Director Letter ("1994 SMDL" or "the Letter"), which explained that training program costs are excluded from the definition of reimbursable administrative costs under the Medicaid statute. The Appeals Board sustained CMS's decision. Our review of the agency's final decision is narrow. We limit our determination to deciding whether the Appeals Board's decision complies with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.[1]

## A. Medicaid Statutory and Regulatory Framework

To begin, we set forth some background of the Medicaid program and its reimbursement provisions for state administrative costs. With the passage of Title XIX of the Social Security Act, Congress authorized the creation of the Medicaid program, 42 U.S.C. §§ 1396 et seq., "a cooperative federal-state program that provides medical care to needy individuals." Douglas v. Indep. Living Ctr. of S. Cal., Inc., 565 U.S. 606, 610, 132 S.Ct. 1204, 1208 (2012). States such as Pennsylvania that opt into the program must submit a plan that complies with the Medicaid statute and the Secretary of Health and Human Services' ("HHS") implementing regulations. 42

---

[1] Of course, the appeal to us is from the order of the District Court but we state the question as if the appeal is from the Appeals Board's decision because our review of the District Court summary judgment is de novo.

4

U.S.C. §§ 1396, 1396a; 42 C.F.R. § 430.15(a).  Within HHS, CMS oversees state compliance with Medicaid requirements. 42 C.F.R. § 430.15(b).

Under this cooperative program, the federal government reimburses a state for a portion of its expenditures for both "medical assistance" (i.e., medical care and services) and "administration" of the Medicaid program.  42 U.S.C. §§ 1396b(a), 1396d(a).  There is a statute establishing the amount of federal funding available to a state for such expenditures, known as Federal Financial Participation ("FFP").  See 42 U.S.C. § 1396b(a).

Section 1396b(a)(7) governs the administrative costs at issue in this case.  Id. § 1396b(a)(7).[2]  Specifically, § 1396b(a)(7) sets the usual amount of FFP at 50 percent for costs that are "found necessary by the Secretary for the proper and efficient administration of the State plan."  That is, states can receive 50 cents on the dollar for costs claimed under their plans that meet the definition of administrative costs in § 1396b(a)(7).  To implement this provision, HHS promulgated 42 C.F.R § 433.15(b)(7), which included the statutory FFP percentage for reimbursement and a summary explanation of administrative costs.  See 42 C.F.R. § 433.15(b)(7) ("All other activities the Secretary finds necessary for proper and efficient administration of the State plan: 50 percent.").  But neither the statute nor the implementing regulation defines "administration" or "necessary."

---

[2] This case only involves claims for administrative costs under § 1396b(a)(7).  Pennsylvania does not claim that the training costs were allowable under other provisions of the Medicaid statute.

5

B. The 1994 SMDL

In 1994 the Health Care Financing Administration ("HCFA"), CMS's predecessor, published the 1994 SMDL. After an influx of inappropriately claimed administrative activities, HCFA issued the Letter to "reiterate [its] long-standing policy on allowable administrative costs." JA 109. The 1994 SMDL quotes § 1396b(a)(7)'s requirement that FFP is permitted only for amounts "found necessary by the Secretary for the proper and efficient administration of the State Plan." JA 109. It then interprets that language to mean that "allowable claims . . . must be directly related to the administration of the Medicaid program." JA 109.

The 1994 SMDL gives examples of administrative costs that HCFA has allowed in the past. Among other items those costs include Medicaid eligibility determinations, Medicaid outreach, prior authorization for Medicaid services, and Medicaid Management Information System development and operation.

The Letter also lists examples of expenses that are not regarded as administrative costs. Importantly for our purposes, it states that allowable costs do not include "the overhead costs of operating a provider facility, such as the supervision and training of providers." JA 113. Besides such training costs, the Letter also excludes costs for medical services. It recites that administrative costs cannot be "the cost of providing a direct medical or remedial service," or "an integral part or extension of a direct medical or remedial service. . . ." Id. It states that "[s]uch services are properly paid for as part of the payment for

6

the medical or remedial service. Because Medicaid providers have agreed to accept service payment as payment in full, such providers may not claim an additional cost as [an] administrative cost under the State plan." Id.

With this background in mind, we turn to this case.

C. Pennsylvania's Restraint Reduction Initiative

In 1987 Congress amended Title XIX of the Social Security Act to include nursing home reforms. The amended Act provided that nursing home facilities could no longer use physical and chemical restraints on their residents for discipline or convenience reasons. 42 U.S.C. § 1396r(c)(1)(A)(ii). The regulations required nursing facilities to train their staff on these new care standards. 42 C.F.R. §§ 483.12(b)(3), 483.95(c).

In response to these reforms, Pennsylvania created the Pennsylvania Restraint Reduction Initiative ("PARRI"). The stated objective of the program which began in 1996 was "to train long term care facility staff in the use of alternative measures to physical and chemical restraints." JA 275, 298. Pennsylvania contracted with Kendal Outreach LLC ("Kendal") to supply the provider training. Kendal began by training nursing home staff at four training sites but expanded the number of sites to twenty six across the state over the next few years.

At all relevant times Pennsylvania paid for the Kendal contract through various funding methods and made claims to CMS to reimburse it for the cost of the contract. Pennsylvania consistently claimed the contract costs as Medicaid program

7

administrative expenses. But it did so without expressly advising CMS of what it was doing for when it completed the CMS form to report administrative costs, it did not specifically itemize the PARRI payments. Instead, it lumped those payments into a larger amount that it claimed as "Other Financial Participation." JA 249. From 1996 to 2011, CMS reimbursed Pennsylvania a total of $3,001,536 for the PARRI program.

Pennsylvania's claims for administrative costs eventually came to the attention of the HHS Office of Inspector General ("OIG"). From 2011 to 2012 the OIG conducted an audit of Pennsylvania's claims for Medicaid administrative costs for provider training under PARRI. According to OIG, the audit was initiated because Pennsylvania relied on the CMS form's "Other Financial Participation" section to claim large sums of FFP. For example, from 2010 to 2011, the OIG audit notes that Pennsylvania claimed $924 million in administrative costs, of which $654 million were unidentified costs lumped together as "Other Financial Participation." JA 265. OIG also noted that it previously identified two other Pennsylvania programs that failed to comply with the administrative cost requirements under the Medicaid program. In the audit, OIG concluded that the PARRI costs were not administrative costs, but rather "were for training nursing home provider staff to improve the condition of nursing home residents." JA 266. The audit report stated that "CMS explicitly prohibits claiming costs for provider training, such as that supplied by Kendal for the Initiative, as administrative costs, because they are not for the proper and efficient administration of the [Medicaid] State plan." Id. (quotation marks omitted). The OIG audit thus recommended that CMS require Pennsylvania to refund the $3,001,536 and

8

discontinue all future claims for PARRI costs.

In June 2014 CMS sent a letter to Pennsylvania notifying it of its decision to disallow the $3,001,536 in FFP. CMS explained the administrative cost requirements under § 1396b(a)(7) and the 1994 SMDL and adopted the OIG's findings. CMS concluded that "the costs of the Initiative do not constitute general administrative costs of the Medicaid program. Rather, these costs constitute nursing facility overhead costs [because] the training was intended to support and augment the in-service training for nursing facilities and to enhance the quality of service delivery at nursing facilities." JA 76.

### D. Procedural Background

Pennsylvania appealed CMS's disallowance decision to the HHS Appeals Board, which affirmed the decision in a written opinion. At the outset, the Appeals Board noted that Pennsylvania made two key factual concessions material to this dispute which thus are material to this appeal: Pennsylvania did not dispute receiving the 1994 SMDL before it created PARRI, and did "not deny that the disallowed claims were for the costs of training nursing facility staff. . . ." JA 26.

The Appeals Board then found that the PARRI costs were disallowable. The Board determined that the 1994 SMDL expressly prohibits states from claiming provider training as a cost of administering the plan. The Board also stated that "the prohibition in the 1994 SMDL on states claiming provider training and other medical assistance costs as costs of administering their Medicaid state plans was not a new policy." JA 27. In support of this observation, the Board cited two of its

9

pre-1994-SMDL decisions, New York State Department of Social Services, DAB No. 1146 (1990), and New York State Department of Social Services, DAB No. 1252 (1991), in which the Board held that provider training costs were not administrative costs under § 1396b.

The Appeals Board further stated that although states cannot claim training costs as administrative costs, CMS may be able to reimburse states for training costs in other ways. Specifically, the Board noted that states can recover provider training costs through provider reimbursements rates for medical assistance. The Board explained that there is a twofold rationale for this authorization. First, when the state claims training costs through the rate system, it must ensure that such costs are reasonable and adequate under the relevant regulations. Second, the prohibition on classifying direct services as administrative costs "is necessary to prevent duplicate program payment for the same activities." JA 30 (internal citations omitted). Thus, the Board stated that Pennsylvania may have been able to use the rate system for reimbursement of the training costs, but it had not done so; and it could not circumvent that treatment by separately claiming training costs as administrative expenses.

Finally, the Appeals Board rejected Pennsylvania's arguments that (1) the 1994 SMDL is an invalid substantive rule, (2) PARRI training cannot be disallowed on the basis of the 1994 SMDL because the training costs were not overhead costs, (3) Pennsylvania is entitled to discovery from CMS on whether it previously agreed to reimburse the PARRI costs as administrative costs, and (4) the HHS Grants Administration

10

Manual ("GAM") limits the disallowance period to three years.[3]

In 2015 Pennsylvania challenged the Appeals Board's decision in the District Court, asserting that the disallowance violated the APA. On the defendants' motion the Court granted summary judgment against Pennsylvania, holding that the administrative record supported the agency action and was consistent with the APA standard of review. Pennsylvania Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs., 241 F. Supp. 3d 506, 517 (M.D. Pa. 2017). Specifically, the Court found that (1) the 1994 SMDL was not a substantive rule subject to APA public notice and comment but rather was an interpretive rule not so subject; (2) Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161 (1944) required the Court to give the Letter judicial deference; and (3) there was no basis under the APA to overturn the Board's conclusions that (a) the 1994 SMDL barred reimbursement of PARRI costs, (b) the disallowance period was not limited to three years, and (c) Pennsylvania was not entitled to additional discovery. Pennsylvania Dep't of Human Servs., 241 F. Supp. 3d at 514-17. The Court also denied Pennsylvania's request to take judicial notice of a 2015 CMS Question and Answer document published online after the Board issued its decision. Id. at 511-12.

Pennsylvania timely appealed from the District Court's final order. See Fed. R. App. P. 4(a)(1)(B).

---

[3] Pennsylvania also argued unsuccessfully that other CMS issuances and regulations permit FFP for provider training costs contrary to the 1994 SMDL, but with limited exception Pennsylvania does not raise those arguments before us now.

11

## III. STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction to review the decision under 42 U.S.C. § 1316(e)(2)(C), 5 U.S.C. §§ 701-706, and 28 U.S.C. 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

"We apply de novo review to a district court's grant of summary judgment in a case brought under the APA, and in turn apply the applicable standard of review to the underlying agency decision." Pennsylvania, Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139, 146 (3d Cir. 2012) (internal quotations omitted). Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," or is conducted "without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(A) & (D).

Under "this narrow standard of review, we insist that an agency examine the relevant data and articulate a satisfactory explanation for its action." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513, 129 S.Ct. 1800, 1810 (2009) (internal citation and quotation marks omitted). Agency action will be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867 (1983).[4]

## IV.  DISCUSSION

Pennsylvania makes six challenges to the disallowance decision and thus to the summary judgment.  It argues that (1) the 1994 SMDL is an invalid substantive rule, (2) the 1994 SMDL's text does not exclude PARRI training costs from reimbursement, (3) the 1994 SMDL imposes an ambiguous condition on a federal grant, (4) the Appeals Board abused its discretion in denying discovery, (5) the HHS Grants Administration Manual limits the disallowance period to three years, and (6) the District Court should have taken judicial notice of the 2015 CMS Question and Answer document.  We will address each argument in turn and explain why we find none persuasive.

### A. The 1994 SMDL Is an Interpretive Rule, Not a Legislative Rule

Pennsylvania's first argument can be regarded as procedural.  Pennsylvania challenges the use of the 1994 SMDL,

---

[4] Pennsylvania incorrectly asserts that our review of many of its arguments is plenary, citing Beta Spawn, Inc. v. FFE Transportation Services, Inc., 250 F.3d 218, 223 (3d Cir. 2001), but that case did not involve an agency action or the APA.  As such, even though our review of the summary judgment is de novo, the standard APA judicial review standards which are more deferential govern this case.

arguing that the agency's reliance on the Letter violated the APA because the Letter was not adopted after compliance with the notice and comment procedures for the adoption of a rule under the APA.  See 5 U.S.C. § 553(b), (c).  Appellees respond that the 1994 SMDL is an interpretive rule, not subject to a requirement for public notice and comment.  See id. § 553(b)(A).  Though we have determined that other HCFA state Medicaid director letters were interpretive rules, see Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 181 (3d Cir. 1995), we never have determined whether the 1994 SMDL is an interpretive rule.  Now, however, in this matter of first impression on this point, we conclude that the 1994 SMDL is interpretive and is not a substantive or legislative rule.

The APA requirement that an agency rule go through notice and comment procedures applies only to so-called "legislative" or "substantive" rules, not to "interpretive" rules.  5 U.S.C. § 553(b), (c).  Though it is not always easy to distinguish between the two types of rules, we have developed guiding principles to aid in distinguishing them.  Legislative rules, which have the force of law, "impose new duties upon the regulated party."  Chao v. Rothermel, 327 F.3d 223, 227 (3d Cir. 2003).  "'Interpretive' rules, on the other hand, seek only to interpret language already in properly issued regulations."  Id. (citation omitted); Elizabeth Blackwell, 61 F.3d at 181 (deeming HCFA's letter to state Medicaid directors that interpreted Medicaid statute to be interpretive guidance because it "clarifies and explains existing law").  Interpretive rules do not add language to or amend language in the statute, Chao, 327 F.3d at 227, but "simply state[] what the administrative agency thinks the statute means, and only remind[] affected parties of existing duties," SBC Inc. v. F.C.C., 414 F.3d 486, 498 (3d Cir. 2005) (quoting

14

Fertilizer Inst. v. U.S. E.P.A., 935 F.2d 1303, 1307 (D.C. Cir. 1991)).

Based on these principles, the 1994 SMDL is an interpretive rule. As stated above, the Letter explains § 1396b(a)(7)'s statutory requirement that costs must be "necessary . . . for the proper and efficient administration of the State plan." JA 109, 112 (emphasis removed). It "reiterates" that CMS interprets the statutory requirement to mean the costs "must be directly related to the administration of the Medicaid program." JA 109, 112. It then explains how that policy works "in several particular situations," JA 112, providing a non-exhaustive list of costs that do and do not meet CMS's interpretation of the statute including the exclusion of training costs.

The 1994 SMDL thus qualifies as an interpretive rule on several levels. The Letter represents what the Secretary "thinks [§ 1396b(a)(7)] means," see SBC Inc., 414 F.3d at 498, i.e., that costs are "necessary" for plan administration when they are "directly related" to plan administration. The Letter also "clarifies and explains" the statute, Elizabeth Blackwell, 61 F.3d at 181, by describing types of costs that are not "directly related," such as the cost of providing direct medical services, see JA 112-13. These features indicate the 1994 SMDL is an interpretive rule.

The Letter's discussion of training costs, the particular portion of the Letter that Pennsylvania challenges, reinforces this conclusion. This discussion about training costs provides an example of how the agency applies its rule in practice, a treatment which we have held is indicative of an interpretive

15

rule.  See Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989) (holding social security administration publication that "contains merely examples of the application of the [at-issue] regulations" was interpretive rule); see also L.A. Closeout, Inc. v. Dep't of Homeland Sec., 513 F.3d 940, 942 (9th Cir. 2008) (per curiam) (holding agency memo "simply provided the agency's construction of the regulation in a particular factual circumstance.  As such, notice and comment procedures were not required").  Finally, inasmuch as the purpose of the Letter is to reiterate the agency position, the Letter expressly "reminds affected parties" of these interpretations in light of states' past misapplication of the rule.  See SBC Inc., 414 F.3d at 498. Accordingly, the 1994 SMDL is an interpretive rule not subject to the APA's notice and comment procedures.[5]

---

[5]The Appeals Board did not address the question of whether the 1994 SMDL is an interpretive or substantive rule.  Instead, it held that "the 1994 SMDL was binding on Pennsylvania in any event."  JA 32.  The Board explained that the 1994 SMDL is entitled to deference because it is a reasonable interpretation of the ambiguous definition of administrative costs in § 1396b(a)(7) and Pennsylvania was on notice of that interpretation.  JA 32.  We question the Board's reasoning.  If the 1994 SMDL Letter were an improperly promulgated legislative rule, the Letter would be invalid—thus the agency could not have based the disallowance on it.  See State of Alaska v. U.S. Dep't of Transp., 868 F.2d 441, 445 (D.C. Cir. 1989) (deeming legislative rule "invalid by virtue of the [agency's] failure to employ notice-and-comment procedures"); see also Elizabeth Blackwell, 61 F.3d at 188 (Nygaard, J., dissenting) (Legislative rules promulgated without notice and comment "are not true legislative rules at all, but rather

16

We realize that Pennsylvania contends that our reading of the Letter contradicts our prior case law. Pennsylvania argues that Federal Labor Relations Authority v. United States Department of the Navy, 966 F.2d 747 (3d Cir. 1992) (en banc) (hereafter "FLRA") is "closely on point" and supports its claim that the Letter is a legislative rule. Pennsylvania Br. 17. But FLRA does not offer support for its contention. Pennsylvania

examples of invalid spurious rules. . . ."). Nonetheless, because we conclude that the 1994 SMDL is an interpretive rule, and because we agree with the Board's conclusion that the 1994 SMDL reiterated longstanding agency policy, we may affirm its decision.

We note that, while we question the agency's reasoning, our decision to affirm comports with the Supreme Court's Chenery doctrine. Under the Chenery doctrine, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." S.E.C. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577 (1947). But the issue here falls under a recognized exception to the doctrine. "Chenery reversal is not necessary where, as here, the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason, and where, as here, the agency's incorrect reasoning was confined to that discrete question of law and played no part in its discretionary determination." United Video, Inc. v. F.C.C., 890 F.2d 1173, 1190 (D.C. Cir. 1989). We therefore may uphold the agency's correct conclusion without endorsing its reasoning.

misreads that case, suggesting that in FLRA we invalidated an Office of Personnel Management ("OPM") interpretation of the word "necessary" because it was a legislative rule that was designed to have a measurable impact. Pennsylvania then likens the circumstances in FLRA to those here, because the agencies in both situations interpreted the word "necessary." Our holding in FLRA was quite different, however, because in that case we assumed, without deciding, that OPM's interpretation was an interpretive rule because the parties and "[o]ther courts of appeals to consider the issue [had] also cast the rule as interpretive." Id. at 762. We then rejected the agency's interpretation for a reason unrelated to this case: because the OPM failed to publish it in a meaningful way. Id. at 764. FLRA accordingly does not support Pennsylvania's erroneous argument that the 1994 SMDL is an invalid substantive rule.

In reaching our result, we have taken into account the recent decision of the United States Court of Appeals for the First Circuit in New Hampshire Hospital Ass'n v. Azar, 887 F.3d 62 (1st Cir. 2018), that was decided after the argument in this case and on which Pennsylvania relies. There, the court held that a CMS answer in a Frequently-Asked-Questions ("FAQ") document was an invalid legislative rule. The FAQ stated, in essence, that hospitals which serve Medicaid patients must reduce their reimbursement claims for those services by any amount they already received from Medicare and private insurance. Two main features led the court to find the FAQ a legislative rule: the absence of a statutory standard for the Secretary's action and the FAQ's bare language. Neither feature appears in our case.

18

First, the statutes underlying the 1994 SMDL and the FAQ are different. New Hampshire Hospital does not concern § 1396b(a)(7) or administrative costs. Rather it involves 42 U.S.C. § 1396r-4(g)(1), which deals with caps on reimbursements to hospitals for medical services to Medicaid patients. Specifically, that statute provides that reimbursements to hospitals for Medicaid services cannot exceed the hospital's "costs incurred" in furnishing those services. But the statute leaves it to the Secretary to decide what payments must be offset from "costs incurred." 42 U.S.C. § 1396r-4(g)(1)(A) ("A payment adjustment during a fiscal year shall not . . . exceed[ ] the costs incurred during the year of furnishing hospital services []as determined by the Secretary. . . ."). The court found it significant that the statute lacked any standard for what "costs incurred" means and left it to the Secretary to fill that gap. It stated that this "textual silence" suggests that any agency rule implementing the statute is likely substantive, reasoning that, "[w]here Congress has specifically declined to create a standard, the [agency] cannot claim its implementing rule is an interpretation of the statute." New Hampshire Hosp., 887 F.3d at 71 (alteration in original) (quoting Mendoza v. Perez, 754 F.3d 1002, 1022 (D.C. Cir. 2014)).

Unlike § 1396r-4(g)(1), which does not provide a standard to guide the Secretary in implementing the "costs incurred" rule, § 1396b(a)(7) does provide a meaningful standard for the administrative expenses rule. It instructs the Secretary that administrative expenses are amounts "found necessary by the Secretary for the proper and efficient administration of the State plan." So, Congress has not granted the Secretary carte blanche authority to fill in a statutory gap as it did in the statute involved in New Hampshire Hospital; rather,

19

it gave the Secretary a rule (administrative costs under § 1396b(a)(7) are reimbursed at 50%) and provided a standard (administrative costs are costs "necessary . . . for the proper and efficient administration of the State plan") to help the Secretary apply that rule in practice. Thus, because § 1396b(a)(7) contains a meaningful standard, the Secretary here can claim that the 1994 SMDL is an interpretation of the statute.

The second feature of New Hampshire Hospital, the bare language, is also absent from our case. There, the court expressed concern with the language used in the FAQ. Specifically, the FAQ stated that "costs incurred" must exclude payments hospitals receive from Medicare and private insurance. In reaching this conclusion, however, the FAQ provided no interpretation of the statute or regulation, and did not explain how the new set-offs flowed from those authorities. The Secretary merely noted the statute's textual silence and asserted the new rule. The court noted that "such an announcement, without reasoned interpretive explanation, looks to us more as if the Secretary is using delegated power to announce a new policy out of whole cloth, rather than engaging in an interpretive exercise." 887 F.3d at 72. Here, however, the 1994 SMDL does link its rule to the statutory and regulatory language. It charts the statutory and regulatory standards, discusses how states have misinterpreted § 1396b(a)(7) in the past, and explains why various expenditures like training costs are more like medical services and overhead than administrative work and thus cannot be "necessary . . . for the proper and efficient administration of the State plan." As such, the Secretary did engage in an interpretive exercise when crafting the 1994 SMDL.

As a side note, we see some irony in Pennsylvania's reliance on New Hampshire Hospital. If anything, the decision cautions us to look out for substantive rules masquerading as agency interpretations in online question-and-answer documents. Yet, as we will see later, Pennsylvania contends that we give a similar CMS document from 2015 controlling weight over the 1994 SMDL. While we take no position on the validity of the 2015 CMS document, we note that New Hampshire Hospital offers no aid to Pennsylvania on that point either.

In sum, New Hampshire Hospital does not change our conclusion that the 1994 SMDL is a valid interpretive rule.

### B. The 1994 SMDL's Application to PARRI Training Costs

Second, Pennsylvania challenges the agency's application of the 1994 SMDL to exclude reimbursement for PARRI training costs as overhead expenses.[6] The 1994 SMDL

---

[6] Pennsylvania does not make a substantial challenge to the District Court's grant of Skidmore deference to the 1994 SMDL. The Court granted Skidmore deference to the Letter because the terms "necessary" and "administration" were undefined in the statute and were ambiguous; Congress delegated the interpretation of those words to the Secretary; and although interpretive guidelines like the 1994 SMDL do not carry the force of law, the 1994 SMDL was persuasive because it "reflect[ed] a reasonable and considered interpretation" of the statute. Pennsylvania Dep't of Human Servs., 241 F. Supp. 3d at 513-14. In response, Pennsylvania argues only that the Court

21

excluded from administrative costs all "overhead costs of operating a provider facility such as the supervision and training of providers." JA 113.

Pennsylvania claims that PARRI training costs cannot be overhead costs. Specifically, Pennsylvania argues that overhead costs are defined as "necessary costs incurred by a company in its operations which cannot be easily identified with any individual product," relying on a definition of "overhead" from an out-of-circuit case about a union dispute published over sixty years ago. Pennsylvania Br. 18 (quoting United Elec., Radio. & Mach. Workers of Am. v. Oliver Corp., 205 F.2d 376, 387 (8th Cir. 1953)). Based on that definition, Pennsylvania claims that the PARRI training costs cannot be regarded as overhead expenditures because PARRI training is not a cost nursing home providers "must incur to operate their facilities," and nursing home providers did not pay for the training. Pennsylvania Br. 18-19.

As a threshold matter on this overhead issue, we note that we question whether we need to decide whether the Letter's discussion of overhead captures PARRI costs because the Appeals Board provided separate support for its disallowance. The Board stated that provider training is disallowable under other portions of the 1994 SMDL, even without the overhead

should not have granted any deference because the 1994 SMDL does permit reimbursement of training costs as administrative costs. Pennsylvania Br. 18. As we will explain in this section, that argument is meritless, the 1994 SMDL does apply to PARRI costs, and there is no reason to disturb the Court's application of Skidmore deference to the Letter.

costs language. Given the language of § 1396b, 42 C.F.R. § 433.15, and the prior Board decisions, the Board found that "exclusion of provider training from Medicaid administration reflects the longstanding principle . . . that a state may not claim costs of medical assistance rendered by providers as the state agency's Medicaid administrative cost." JA 31. Thus, the finding that provider training is related to medical assistance and therefore cannot be an administrative cost is a sufficient basis for us to uphold the decision.

Nonetheless we will reach Pennsylvania's argument. We conclude that the Appeals Board considered Pennsylvania's arguments and rendered a plausible decision rejecting them. See Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43, 103 S.Ct. at 2867. The Board gave no weight to Pennsylvania's narrow definition of overhead. We, too, see no reason to read "overhead" to mean costs a company "must" incur. Indeed, as the term is generally understood, "overhead" can include all kinds of costs, both necessary and permissive. See OVERHEAD, Black's Law Dictionary (10th ed. 2014) (making no mention of costs that must be incurred). Further, were we to agree that Pennsylvania's definition was more on point than the Secretary's, we still would side with the Secretary because the Secretary bears responsibility for making the overhead determination. See Elizabeth Blackwell, 61 F.3d at 181 ("[p]erhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Medicaid] Act.") (quoting Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640 (1981)) (alterations in original). Thus, because the Board gave a plausible reason to reject Pennsylvania's narrow definition of overhead, and

23

because the Secretary has broad authority to define overhead, we reject Pennsylvania's argument that the 1994 SMDL excludes only provider training that a company must incur.

We also reject Pennsylvania's argument that PARRI training costs are allowable because nursing home providers did not pay for them. The argument goes as follows: providers pay for overhead costs, but the state, not the provider, paid for the training, so the cost of the training cannot be an overhead cost. But that argument misses the point. Had Pennsylvania structured the PARRI payments correctly, the providers would have paid for the training. And CMS could have reimbursed Pennsylvania for those costs if Pennsylvania factored the amount into its rate-setting scheme instead of claiming the amount as administrative costs.

The 1994 SMDL and the Appeals Board explained why this is the case. The Letter explains that "[s]uch services are properly paid for as part of the payment made for the medical or remedial service." JA 113. It states that "[b]ecause Medicaid providers have agreed to accept service payment as payment in full, such providers may not claim an additional cost as [an] administrative cost under the State plan." Id. The Board further explained, as noted above, that this payment scheme forces states to ensure that the costs are reasonable and adequate, and prevents duplicative payments to states and providers for the same activity. So, even accepting Pennsylvania's claim that overhead must be paid by the provider, its argument still fails because the provider should have paid the costs for the PARRI training.

But Pennsylvania contends that CMS encouraged

Pennsylvania to create the PARRI program, so it argues that CMS cannot now say that Pennsylvania should not have paid for the program. We disagree. CMS may well have encouraged Pennsylvania to create the training program. Indeed, it makes sense that CMS would have done so. The program ensured faster and smoother rolling-out of the nursing home reforms. But it is wrong to say that CMS's support for the program conflicts with its opposition to the state paying for the program directly. Those issues are different and reconcilable. In other words, CMS did encourage Pennsylvania to create the PARRI program, but there is no evidence that CMS encouraged Pennsylvania to pay for the training program directly and then claim those payments as administrative costs. Rather, based on the record, CMS showed no support for the kind of payment scheme Pennsylvania employed. It instead showed support for the rate-setting scheme where providers paid for the training themselves and then the states factored those payments into the rate-setting calculation. Thus, the fact that CMS encouraged Pennsylvania to create the training program does not make its disallowance of the PARRI costs arbitrary and capricious.

In fact, the Appeals Board's position that Pennsylvania should have used the rate-setting scheme to have obtained reimbursement is consistent with its prior treatment of training costs. For example, in New York State Department of Social Services, DAB No. 1146 (1990), the state, like Pennsylvania here, claimed FFP for the cost of contracts to train nursing home employees. HCFA, like CMS here, disallowed the payments because they were not necessary for the proper and efficient administration of the state plan. On appeal the Board affirmed, finding that the costs were related to the services provided by provider facilities, and explained why the rate-setting

methodology was the best way, in the agency's view, to reimburse such costs. It further rejected the state's argument that "as a practical matter, it had no other way to recover these costs," reasoning that the state's failure to structure its scheme properly does not allow the state to "change the character of the expenditure from a services cost to an administrative cost." Id. at 6-7. This prior decision reinforces the Board's decision in this case that providers must pay for their own training costs.

Pennsylvania argues that we should not give these prior decisions any weight. It asserts that the Appeals Board does not have authority to create formal policy for the Secretary, so we should not consider those prior decisions. But even if the Board's decisions do not constitute formal policy, they are helpful because they show that the agency had a consistent position on training costs. Cf. Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs., 747 F.3d 172, 179 (3d Cir. 2014) ("Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.").

In sum, under our narrow review, we will not disturb the agency's finding that PARRI costs are not reimbursable as administrative costs. The Appeals Board determined that PARRI training costs are excludable provider training costs under the Medicaid statute as reflected in the Letter; that such training costs should be paid by providers and factored into the state's rate-setting calculations; that two reasons exist for the rate-setting payment calculations; that those reasons comport with the Board's prior treatment of the same issue; and Pennsylvania gave no reason why those bases are unsound. As such, the APA counsels us to defer to the agency's decision.

26

## C. The 1994 SMDL Is Not an Ambiguous Condition on a Federal Grant

Pennsylvania next argues that, even if we read the 1994 SMDL to disallow PARRI costs, the disallowance violates constitutional spending clause principles. Pennsylvania asserts that the 1994 SMDL's discussion of training costs and overhead costs is ambiguous, and therefore the Letter failed to provide sufficient notice that training expenses were disallowable. Consequently, Pennsylvania claims, the disallowance is invalid.

In support, Pennsylvania cites Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531 (1981) and its progeny, which upheld Congress' power to attach conditions to federal grants to states so long as the conditions are stated unambiguously. Id. at 17, 101 S.Ct. at 1540. To determine whether a statute satisfies this clarity requirement, courts "ask whether . . . a state official would clearly understand . . . the obligations" of the law, and "whether the [statute] furnishes clear notice regarding the liability at issue in [the] case." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296, 126 S.Ct. 2455, 2458 (2006). Because a conditional grant is akin to a contract, recipients of federal funds should accept the attached conditions "voluntarily and knowingly." Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540. "[W]e must view the [Medicaid statute] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds." Arlington, 548 U.S. at 296, 126 S.Ct. at 2459.

We reject Pennsylvania's argument. We note first that the argument is narrow. Pennsylvania does not claim that the

27

Medicaid statute—§ 1396b(a)(7)—or the implementing regulations set forth ambiguous conditions of a federal grant. It levels that claim against only the 1994 SMDL. With that narrow scope in mind, Pennsylvania's theory is shaky. Pennsylvania provides no case—nor are we aware of one—where a court invalidated a spending condition based on an agency's position in interpretive guidance. Nor do we know of such an invalidation where the plaintiff challenges the guidance but takes no issue with the controlling statute and regulations.

In any event, even if Pennsylvania had case law support, its theory would fail. We must consider Pennsylvania's claim from the perspective of a state official. Arlington, 548 U.S. at 296, 126 S.Ct. at 2459. Pennsylvania does not challenge either the statute or the regulation. Consequently, Pennsylvania does not dispute the circumstance that the official knew the state could claim administrative costs that are necessary for the proper administration of the plan, 42 U.S.C. § 1396b(a)(7), and also knew that determination was left to the sole discretion of the Secretary of HHS, id.; 42 C.F.R. § 433.15(b)(7). Nonetheless, Pennsylvania claims that the Letter is an ambiguous condition on a grant because the official would not have known that the Secretary could deem training costs to be disallowable overhead costs in the 1994 SMDL. But that argument makes little sense. If the official knew the applicable test and knew the Secretary had discretion to apply the test; and the Secretary applied the test reasonably, as we conclude the Secretary did here, then the official cannot claim not to have been on notice that the disallowance was possible.

At bottom, Pennsylvania's position is merely that it did not know for sure that the Secretary would deny the PARRI

costs until it received CMS's disallowance letter. But that circumstance does not make the Secretary's decision to exclude the training costs an ambiguous condition of funding. Rather, as is true when an agency reasonably exercises discretion, there always was a possibility that the Secretary would make the decision reached here. And Pennsylvania was on notice of that possibility when it accepted the Medicaid funds. As such, we reject Pennsylvania's argument that it lacked notice of a condition of receiving the Medicaid funds.

### D. The Denial of Discovery Was Not Abuse of Discretion

Fourth, Pennsylvania claims that the Appeals Board abused its discretion when it denied it the opportunity for discovery. Under HHS regulations, the Board may authorize discovery when it determines that it is appropriate to do so. 45 C.F.R. § 16.9 ("The Board may, at the time it acknowledges an appeal or at any appropriate later point, request additional documents or information . . . and take such other steps as the Board determines appropriate to develop a prompt, sound decision."). Here, Pennsylvania requested the opportunity for discovery to determine if CMS had promised to pay the state for the PARRI costs. Pennsylvania claimed that it has purged any such documents, if they existed, pursuant to its record retention policy. The Board denied the motion as speculative and lacking any factual basis. We agree because Pennsylvania did not provide a reason to believe CMS made that promise.

Pennsylvania claims that it should have been allowed the opportunity for discovery for two reasons. First, it notes that CMS had been paying for the PARRI costs since 1996 but then

29

abruptly changed course. Pennsylvania claims that this abrupt change raised enough suspicions to warrant discovery. However, the OIG audit explains the reason for the change in course. The audit recites that Pennsylvania claimed the PARRI costs as "Other Financial Participation" without further detail for years until the payments came to OIG's attention due to previous payment issues. Then Pennsylvania states that a CMS representative was on the PARRI task force and might have information about any payment agreement. But Pennsylvania does not state what this representative's role was vis-à-vis CMS and the task force or explain the representative's function on the PARRI task force or how the representative was involved in Pennsylvania's reimbursement scheme. Consequently we uphold the Board's decision to deny discovery.

### E. HHS Grants Administration Manual

Pennsylvania's penultimate argument seeks to limit the lookback period for CMS's disallowance decision to three years. The HHS Grants Administration Manual ("GAM" or "the Manual") then in effect, set a time period for computing disallowances. JA 191; GAM § 1-105-60(C)(3)(a)(1). The Manual states that the disallowance period "will cover" the time-period the organization was required to retain records. JA 191.[7] The parties agree that the applicable regulations required

---

[7] The relevant language in the GAM provides:

**3. Time Period for Computing Disallowances**

a. If the Action Official determines that certain costs should be disallowed, the computation of

30

Pennsylvania to keep the records for three years from the date Pennsylvania sent the expenditure reports to CMS, though the parties also agree that Pennsylvania retained its records for the full period for which reimbursement was disallowed. Because OIG told Pennsylvania about its audit in July 2011, Pennsylvania argues that the GAM limits CMS's disallowance to 2008, three years earlier.

The Appeals Board disagreed. Citing prior Board decisions, it held that "the GAM provision does not state that for <u>all</u> disallowances, the computation will <u>only</u> cover the period of time records are required to be retained." JA 35 (internal quotation marks omitted) (emphasis in original). The Board further held, based on prior Board precedent, that "the GAM provision [does] not bar the disallowance where records in fact exist to support the computation of the disallowance, so the grantee is not prejudiced by the passage of time." <u>Id</u>. Because Pennsylvania did not claim that the records had been destroyed, and because there were sufficient records to calculate accurately the disallowance back to 1996, the Board affirmed the full fifteen-year disallowance period.

Pennsylvania argues that the Appeals Board was wrong

---

the disallowance will cover the following periods.

(1) If the costs can be identified to specific awards, the computation will cover the period the organization is required to retain records under applicable records retention requirements.

GAM § 1-105-60(C)(3)(a)(1). JA 191.

because the GAM permits only a three-year disallowance period. We disagree, though we resolve the issue without weighing in on the agency's reading of the GAM. No matter the interpretation of the GAM, the agency was not bound by the three-year time limit. The GAM was not binding because it "satisf[ies] none of the criteria which have been developed by the courts to determine whether agency regulations have the force of law." Gatter v. Nimmo, 672 F.2d 343, 347 (3d Cir. 1982); see also Schweiker v. Hansen, 450 U.S. 785, 789-90, 101 S.Ct. 1468, 1471-72 (1981) ("[T]here is no doubt that [the agency employee] failed to follow the Claims Manual. . . . But the Claims Manual is not a regulation. It has no legal force, and it does not bind the [agency]."). The GAM sets out audit policies and procedures for internal use by HHS employees or auditors acting on HHS's behalf;[8] it was not published in the

---

[8]JA 188 (explaining applicability of GAM to audit procedures); see also U.S. Dep't of Health and Human Servs., Grants Policy Statement ii (Jan. 1, 2007) ("Recipients are not directly subject to the requirements of HHS Grants Policy Directives and implementing HHS Grants Administration Manuals (or any predecessor OPDIV manuals), which are internal documents guiding HHS operations."), https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf.

Pennsylvania claims, however, that the Secretary has cited the Manual in the Code of Federal Regulations, meaning it is not merely a guiding document. That is incorrect. While the Secretary has promulgated regulations that require compliance with unrelated GAM policies, see, e.g., 42 C.F.R. §§ 86.19, 86.33 (requiring compliance with GAM section concerning

federal register or promulgated with public notice and comment; and there is no other evidence the agency meant to give the GAM binding force. Accordingly, the GAM was promulgated to assist the agency in running its audits rather than to set forth a binding legal mandate. See Gatter, 672 F.2d at 347; Concerned Residents of Buck Hill Falls v. Grant, 537 F.2d 29, 38 (3d Cir. 1976) ("[S]ince the Guide and the Handbook are merely internal operating procedures, rather than regulations officially promulgated under the APA or otherwise, they do not prescribe any rule of law binding on the agency."). And consequently, because the agency has shown that the disallowance decision captures every year for which accurate records of Pennsylvania's erroneous claims exist, the decision is not arbitrary and capricious.

### F. Judicial Notice of CMS's Post-Disallowance Statement

Finally, Pennsylvania claims that the District Court erred in not taking judicial notice of a CMS statement about training costs issued in July 2015, three months after the Appeals Board issued its final decision in this case and thus long after the events involved in this case.

In July 2015 CMS issued a "Questions and Answers" document addressing administrative claims for training costs. One of the three questions reads as follows:

animal welfare), there is no regulation requiring compliance with the GAM's policy for computing the disallowance time period.

Q: Is federal Medicaid administrative match available for provider training activities?

A: Yes. Provider training provided by the Medicaid agency or its contracted designee regarding the scope or the benefits of Medicaid covered services, or that is aimed at improving the delivery of Medicaid services, is reimbursable as a Medicaid administrative expenditure. This could include, for example, training for case managers, individuals who develop and coordinate person-centered care planning, primary care practitioners, or hospital discharge planners.

JA 53.

After the District Court denied Pennsylvania's motion to supplement the administrative record with this document on the ground that it was published after the agency rendered its decision, Pennsylvania asked the Court to take judicial notice of the document. The Court declined to do so because it regarded the request as an "end around the restrictions on record supplementation" and the parties disputed what the CMS document meant. Pennsylvania Dep't of Human Servs., 241 F. Supp. 3d at 511-12. Pennsylvania challenges the decision not to take judicial notice of the statement, and we review the Court's decision on the point for abuse of discretion. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1323 (3d Cir. 2002).

A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute. Fed. R. Evid. 201(b). "A judicially noticed fact must either be generally

34

known within the jurisdiction of the trial court, or be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Werner v. Werner, 267 F.3d 288, 295 (3d Cir. 2001).

Here, the District Court did not abuse its discretion in declining to take judicial notice of the CMS Question and Answer document. Although the document appears to provide some support for Pennsylvania's contention that PARRI costs are now allowable, such a conclusion is not indisputable. In order to reach that conclusion, several related questions which the document does not address must be answered as well. For example, it is unclear if this rule reverses the 1994 SMDL or clarifies a requirement that the Letter already states. It is also unclear without more information how the answer can be squared with 42 C.F.R. § 433.15(b)(7)'s requirement that the training must be "necessary for proper and efficient administration of the State plan" because arguably training for medical services is distinct from the administration of a Medicaid plan. We take no position on these questions, but note that they open up the CMS document to reasonable dispute.

Furthermore, even if we agreed with Pennsylvania that the document clearly contradicts the 1994 SMDL, we still would not conclude that the District Court erred in declining to judicially notice it. Just as the Secretary had authority to interpret the Medicaid statute in the 1994 SMDL, so, too, does the Secretary have the right to change the CMS interpretation over the course of years. See Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne, 497 F.3d 337, 350-51 (3d Cir. 2007) ("[A]n administrative agency is not disqualified from changing its mind. . . .") (quoting Good Samaritan Hosp. v.

35

<u>Shalala</u>, 508 U.S. 402, 417, 113 S.Ct. 2151, 2161 (1993)). And if the Question and Answer document is in fact an about face on the issue of training costs, as Pennsylvania suggests, that circumstance would call into question the new policy change, not CMS's original position from 1994. <u>See</u> <u>Revak v. Nat'l Mines Corp.</u>, 808 F.2d 996, 1002 (3d Cir. 1986) ("We do not believe that we should defer to the [agency's] change of policy in the absence of [a reasoned analysis by the agency]."), <u>abrogated on other grounds by</u> <u>Mullins Coal Co. of Va. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor</u>, 484 U.S. 135, 159 & n.34, 108 S.Ct. 427, 440 & n.34 (1987). Consequently, we cannot say that the District Court erred in declining to take judicial notice of the document.

## V. CONCLUSION

For the foregoing reasons, we will affirm the order of the District Court entered March 13, 2017, affirming the decision of the Appeals Board.